**IN THE UNITED STATES DISTRICT COURT FOR MARYLAND**
**(Greenbelt Division)**

JULIEANNE WILKENING, individually and
as parent and next friend on behalf of E.T., a minor
8755 Justice Ridge Place
Nokesville, Virginia 20181

And

JON TERRELL, individually and as parent and
next friend on behalf of E.T., a minor
8755 Justice Ridge Place
Nokesville, Virginia 20181

Plaintiffs,

v. Case No.:

MAJ. KATHERINE DENGLER, M.D.
4494 North Palmer Road
Bethesda, Maryland 20889

And

CPT. ASHLEY COGGINS, M.D.
4494 North Palmer Road
Bethesda, Maryland 20889

And

UNITED STATES OF AMERICA

Serve On:
Kelly O. Hayes, Esquire
United States Attorney for Maryland
6406 Ivy Lane, Suite 800
Greenbelt, MD 20770

And

Serve On:
Todd Blanche, Esquire
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Defendants.

**COMPLAINT**

Plaintiffs, Julieanne Wilkening, individually and as parent and next friend on behalf of E.T., a minor, and Jon Terrell, individually and as parent and next friend on behalf of E.T., a minor, by and through undersigned counsel, Michael V. Nakamura, Esquire, Daniel P. Connors, Esquire, and the law firm of Shulman Rogers, P.A., hereby file this Complaint against Defendants Maj. Katherine Dengler, M.D., Cpt. Ashley Coggins, M.D., and United States of America, jointly and severally, and in support thereof state the following:

**PARTIES**

1. Plaintiff Julieanne Wilkening (hereinafter "Mrs. Wilkening") is an adult resident and resides at 8755 Justice Ridge Place, Nokesville, Virginia 20181, and a retired military servicemember.

2. Plaintiff Jon Terrell (hereinafter "Mr. Terrell") is an adult civilian resident and resides at 8755 Justice Ridge Place, Nokesville, Virginia 20181.

3. Mrs. Wilkening and Mr. Terrell are a married couple residing together as husband and wife.

4. Plaintiff E.T. (hereinafter "Twin B" or "E.T.") is a minor under the age of 18. This matter stems from events surrounding E.T.'s birth. Mrs. Wilkening and Jon Terrell are the natural parents and legal guardians of E.T.

5. At all times relevant hereto, Defendant Maj. Katherine Dengler, M.D. (hereinafter "Dr. Dengler") was a physician licensed in the State of Maryland providing health related services at Walter Reed National Military Medical Center in Montgomery County, Maryland and elsewhere, including patients such as Mrs. Wilkening and E.T.

6. At all times relevant hereto, Defendant Cpt. Ashley Coggins, M.D. (hereinafter "Dr. Coggins") was a physician licensed in the State of Maryland providing health related services at Walter Reed National Military Medical Center in Montgomery County, Maryland and elsewhere, including patients such as Mrs. Wilkening and E.T.

7. Upon information and belief, and at all times relevant hereto, Walter Reed National Military Medical Center (hereinafter "Walter Reed") is a health care facility located at 4494 North Palmer Road, Bethesda, Maryland 20889, providing health related services, including emergency room, medical, surgical, nursing, diagnostic, obstetric care and other medical services in Montgomery County, Maryland and elsewhere, including patients such as Mrs. Wilkening and E.T.

8. Upon information and belief, and at all times relevant hereto, Walter Reed held itself out as being a full-service medical center, able to provide proper medical, surgical, nursing, diagnostic, obstetric care, labor and delivery services, and other medical services necessary to properly evaluate, diagnose, and treat patients such as Mrs. Wilkening and E.T.

9. At all times material, Walter Reed, located and operating in Bethesda, Maryland, was owned and operated by Defendant United States of America.

10. Upon information and belief, and at all times relevant hereto, the medical care rendered to Mrs. Wilkening and E.T. by the medical personnel at Walter Reed was provided by medical and nursing staff and employees of the Defendant United States of America (hereinafter "United States"), acting within the scope of their employment, and therefore, the United States is liable for their acts of negligence.

11. Upon information and belief, and at all times relevant hereto, the employees and staff of Walter Reed, for which the Defendant United States is liable, who rendered care to Mrs.

Wilkening and E.T., including but not limited to Dr. Dengler and Dr. Coggins, were employees, agents, servants, and/or ostensible agents of the United States, and are liable for their negligent acts and all resulting damages stemming therefrom.

12. The United States is a Defendant in this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671 et seq. This Court has supplemental jurisdiction over the remaining Defendants pursuant to 28 U.S.C. § 1367(a).

13. Furthermore, pursuant to 28 U.S.C. § 2675(a), the allegations set forth herein were presented to the Department of the Navy on or about May 15, 2020, via the filing of an administrative claim. Six (6) months have expired since the filing of the original claim, and, accordingly, all administrative remedies have been exhausted. Thus, by operation of law, the Plaintiffs have met the prerequisite for filing suit for damages against the United States under the FTCA.

14. Because this action arises from alleged medical negligence occurring in Maryland, Plaintiffs have also complied with the applicable requirements of the Maryland Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. §§ 3-2A-01 et seq. Plaintiffs timely filed a Statement of Claim with the Maryland Health Care Alternative Dispute Resolution Office ("HCADRO") and waived arbitration. A copy of the HCADRO Order of Transfer is attached hereto as Exhibit 1.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1402(b), because the acts and omissions giving rise to Plaintiffs' claims occurred within the District of Maryland.

## FACTUAL ALLEGATIONS

16. At the time of these events, Mrs. Wilkening was a 38-year-old, Gravida 3, para 1-0-1-1, pregnant with twins conceived through in vitro fertilization (IVF). The prenatal records reflect a normal course, with no reported complications or fetal abnormalities.

17. On September 7, 2018, Mrs. Wilkening was evaluated by Jill E. Long during a routine follow-up visit at the Obstetrician Clinic. The note reflects that the pregnancy was at 36 weeks and 6 days, assessed as "Uncomplicated," with a stated estimated due date of September 15, 2018. She presented for a routine third-trimester prenatal examination and was scheduled for induction of labor at 38 weeks on September 15, 2018.

18. The assessment and plan documented: (1) dichorionic/diamniotic twin pregnancy in the third trimester, with induction scheduled for 9/15/2018, and (2) discussion of a possible breech extraction of the second twin, with Mrs. Wilkening expressing agreement if necessary.

19. On September 12, 2018, the most recent Biophysical Profile (BPP) indicated reassuring status for both Twin A and Twin B (E.T.). Twin B was specifically noted as: "reassuring fetal status, BPP 8/8, breech presentation, maternal right." Mrs. Wilkening was instructed to call on the morning of Saturday, September 15, 2018, to confirm the time to report for induction of labor.

20. On September 15, 2018, in accordance with the Labor and Delivery plan, Mrs. Wilkening presented to Walter Reed for induction of labor at 38 weeks and 2 days with twins.

21. On September 16, 2018, Mrs. Wilkening was noted to have entered active labor at 4:10 a.m., marking the beginning of the labor process requiring close monitoring and preparation for delivery.

22. Before the initiation of labor induction, Twin A was documented to be in a cephalic position, meaning the fetus was positioned head-down in the uterus, which is generally considered favorable for vaginal delivery.

23. Before the induction of labor began, Twin B (E.T.) was documented to be in a footling breech position, meaning the fetus was positioned with one or both feet presenting first rather than the head. This presentation is considered higher risk for vaginal delivery and may require special management, specifically a potential Cesarean Section delivery, during labor.

24. Anesthesia care for Mrs. Wilkening began at approximately 4:18 a.m., and she was subsequently brought into the operating room. An epidural was successfully placed at approximately 4:28 a.m. to provide pain management during labor and facilitate monitoring and management of the delivery process.

25. At approximately 4:42 a.m., the operating room was prepared as a double setup to accommodate the delivery of twins. The plan of care indicated that efforts would first focus on the vaginal delivery of Twin A, with contingency preparations in place to proceed to a cesarean section if required for the safe delivery of Twin B (E.T.).

26. Mrs. Wilkening reached full cervical dilation at approximately 5:00 a.m., indicating that the cervix had opened completely in preparation for delivery. This milestone marked the transition from the active labor phase to the pushing phase, signaling that Mrs. Wilkening was ready for the onset of fetal delivery.

27. Twin A was confirmed to be in a cephalic (head-down) position and was subsequently delivered vaginally without complications at approximately 6:03 a.m. The spontaneous delivery of Twin A marked the successful completion of the first stage of twin delivery, allowing the medical team to prepare for the delivery of E.T.

28. At approximately 6:10 a.m., seven minutes following the delivery of Twin A, the legs of E.T. were delivered. This confirmed that E.T. was presenting in a breech position, requiring careful and heightened management by the delivery team to safely complete the birth.

29. Multiple attempts and obstetric maneuvers were performed in an effort to deliver both the arms and the head of E.T., including attempts to use forceps, but these efforts were unsuccessful. E.T.'s right arm was identified as being in a nuchal position (caught behind the neck), preventing delivery, and, of greater concern, the fetal head became entrapped, creating a critical obstetric emergency requiring immediate intervention.

30. At approximately 6:20 a.m., a Pfannenstiel incision was performed to gain access to Mrs. Wilkening’s abdomen. The need for emergent surgical intervention at this stage followed multiple unsuccessful attempts to deliver E.T. vaginally, raising concerns regarding the timeliness and management of the delivery process given the critical entrapment of the fetal head and arms.

31. At approximately 6:22 a.m., nearly 20 minutes following the delivery of Twin A, the obstetric team formally declared an obstetric emergency. This declaration came in response to ongoing difficulties in delivering E.T., including entrapment of the fetal head and arms, highlighting the critical and potentially life-threatening nature of the situation and raising questions about the timeliness of interventions, due to the potential of oxygen deprivation to the fetus and hypoxic birth injury.

32. At approximately 6:23 a.m., a surgical timeout was conducted, and the emergency procedure to deliver E.T. commenced at approximately 6:24 a.m. The intervention involved a hysterotomy, or surgical incision into the uterus.

33. E.T. was ultimately delivered at approximately 6:26 a.m., approximately 22 minutes after the birth of Twin A. The infant's Apgar scores were recorded as 0 at one minute, 2 at five minutes, and 2 at ten minutes, reflecting severe distress and significant oxygen compromise. Such critically low scores are strongly indicative of hypoxic-ischemic injury and suggest the presence of neurologic impairment sustained during the delivery process.

34. Dr. Dengler and Dr. Coggins were the attending obstetricians responsible for leading and directing the delivery of E.T., including all critical decisions regarding labor management and emergent interventions.

35. Despite having documented prior knowledge of E.T.'s breech presentation, the well-established risks associated with breech deliveries, and prior knowledge of a potential cesarean section, Dr. Dengler and Dr. Coggins failed to act timely and take appropriate action to prevent a hypoxic injury to E.T. The negligent delay by the medical team transformed a manageable complication into a preventable obstetric emergency, necessitating a high-risk, last-minute surgical rescue of E.T.

36. Furthermore, it is noted that because of the crisis nature of the surgical intervention, the anesthesiologist was unable to adequately assess or confirm the depth of anesthesia prior to making the surgical incision. As a result, Mrs. Wilkening experienced severe pain during the procedure, which not only caused significant physical distress but also inflicted substantial psychological trauma. Mrs. Wilkening was effectively subjected to surgery without proper anesthesia, representing a serious lapse in standard perioperative care.

37. Following her birth, E.T. was diagnosed with neonatal asphyxia, Erb's palsy, neonatal seizures, and moderate to severe hypoxic-ischemic encephalopathy (HIE). Her Apgar

scores were critically low, and she required chest compressions, epinephrine, and intubation immediately after birth.

38. On admission to the Neonatal Intensive Care Unit (NICU), E.T. presented with dusky coloring, absence of typical reflexes, and limited spontaneous movement. Early neurodiagnostic testing revealed profound neurologic compromise, including abnormal electroencephalogram (EEG) findings and subdural hemorrhages on brain magnetic resonance imaging (MRI). These neonatal complications reflect severe and preventable injury, establishing a foundation for her ongoing developmental and functional impairments.

39. E.T., now eight years old, suffers from significant, lifelong medical complications directly stemming from her complicated breech delivery. Her early developmental trajectory has been markedly affected, necessitating special education services since her enrollment in school.

40. Evaluations identified delays in language and literacy, motor development, social-emotional functioning, and pre-academic skills. Despite ongoing interventions, including three weekly resource sessions at her current private school and significant parental support, she continues to experience pronounced difficulties in multiple areas of cognitive and academic functioning relative to her peers. She demonstrates persistent deficits in expressive and receptive language, fine motor coordination, and educational skills such as reading, writing, and mathematics, underscoring the enduring impact of her birth-related injuries.

41. Neuropsychological testing confirms ongoing and substantial deficits requiring clinical and educational intervention. E.T. meets criteria for a Language Disorder, Developmental Coordination Disorder, Attention-Deficit/Hyperactivity Disorder (Combined

Presentation), Specific Learning Disorder with impairments in reading, written expression, and mathematics, and an unspecified anxiety disorder.

42. Standardized assessments place her consistently in the lowest percentiles of age-matched peers across verbal comprehension, working memory, attention, academic achievement, and visual-motor integration. These impairments not only hinder her current educational progress but also create a high risk for continued academic, social, and emotional challenges throughout her life, demonstrating the profound and lasting consequences of the injuries sustained during her birth.

43. Mrs. Wilkening has suffered significant emotional, psychological, and physical harm as a direct result of the birth injuries sustained by her daughter, E.T. The trauma of witnessing a prolonged and complicated labor, including repeated unsuccessful delivery attempts, emergency surgical intervention, and her child's critical condition at birth, caused Mrs. Wilkening profound distress.

44. In the years following the birth, Mrs. Wilkening has endured ongoing emotional and psychological burdens, including anxiety, worry, and stress related to her daughter's medical, developmental, and educational needs. These burdens have required her to devote significant time and energy to medical appointments, therapy sessions, special education coordination, and daily caregiving, substantially impacting her quality of life, personal well-being, and ability to pursue normal daily activities.

45. Mr. Terrell has suffered significant emotional, psychological, and physical harm as a direct result of the birth injuries sustained by his daughter, E.T. The trauma of witnessing a prolonged and complicated labor, including repeated unsuccessful delivery attempts, emergency surgical intervention, and his child's critical condition at birth, caused Mr. Terrell profound

distress. He experienced intense fear, anxiety, and helplessness during the delivery, compounded by the knowledge that delays and mismanagement contributed to E.T.'s severe neonatal injuries.

46. In the years following the birth, Mr. Terrell has endured ongoing emotional and psychological burdens, including anxiety, worry, and stress related to his daughter's medical, developmental, and educational needs. These burdens have required him to devote significant time and energy to medical appointments, therapy sessions, special education coordination, and daily caregiving, substantially impacting his quality of life, personal well-being, and ability to pursue normal daily activities.

47. As a direct result of the negligence of the United States, acting through its employees, servants, agents and/or ostensible agents, including Dr. Dengler, Dr. Coggins and others, Mrs. Wilkening sustained physical and emotional pain and suffering, and pecuniary loss.

48. As a direct result of the negligence of Dr. Dengler and Dr. Coggins, Mr. Terrell sustained emotional pain and suffering, and pecuniary loss.

49. As a direct result of the negligence of Dr. Dengler and Dr. Coggins, E.T. sustained permanent injury requiring past and future medical treatment and therapy, physical and emotional pain and suffering, and pecuniary loss. E.T.'s birth-related injuries are expected to have a lasting impact on her future employment potential, limiting the types of work she may be able to perform and affecting her earning capacity.

50. As a direct result of the negligence of the United States, acting through its employees, servants, agents and/or ostensible agents, including Dr. Dengler, Dr. Coggins and others, E.T. sustained permanent injury requiring past and future medical treatment and therapy, attendant care, physical and emotional pain and suffering, and pecuniary loss. E.T.'s birth-related

injuries are expected to have a lasting impact on her future employment potential, limiting the types of work she may be able to perform and affecting her earning capacity.

**COUNT I - MEDICAL NEGLIGENCE**
**(Maj. Katherine Dengler, M.D.)**

51. Plaintiffs incorporate the substance of the foregoing factual allegations into this Count as if fully stated herein, and further state:

52. At all times relevant hereto, Dr. Dengler had a duty to provide Mrs. Wilkening and E.T. with a degree of care and skill exercised by a reasonable and prudent Health Care Provider under the same or similar circumstances.

53. Dr. Dengler breached her duty of care and acted negligently in her management of Mrs. Wilkening and E.T. Her breaches in the standard of care include, but are not limited to, improperly managing Mrs. Wilkening's labor and delivery, failing to anticipate and plan for all potential complications associated with E.T.'s breech and twin delivery, and failing to expeditiously initiate a cesarean section despite documented advance knowledge of its necessity. Dr. Dengler also failed to respond promptly and appropriately when complications arose during her delivery, and the hysterotomy performed fell below the accepted standard of care. Additionally, she did not take adequate precautions or implement sufficient measures to prevent foreseeable injury to E.T., and otherwise failed to provide medical care consistent with the applicable standard of care.

54. Additionally, Dr. Dengler failed to properly and adequately inform Mrs. Wilkening of the risks of injury to E.T. associated with a vaginal breech delivery and failed to obtain appropriate informed consent as to all delivery options, including a planned cesarean section for Twin B, thereby depriving Mrs. Wilkening of the opportunity to make a fully informed decision regarding the method of delivery.

55. The standard of care mandates that the attending obstetrician, Dr. Dengler, was responsible for leading and directing the delivery, including all critical decisions regarding labor management and emergent interventions. The accepted standard of care for an experienced obstetrician in this high-risk setting required timely recognition and expeditious management of complications, proactive planning for potential cesarean delivery, and immediate intervention when fetal distress or difficult presentations arose.

56. Despite documented advance knowledge of E.T.'s breech presentation and the inherent risks of twin delivery, Dr. Dengler failed to act emergently or appropriately when complications occurred, including the inability to deliver E.T.'s right arm and subsequent entrapment of the fetal head. This failure to initiate a timely cesarean section created a preventable obstetric emergency, necessitating a high-risk surgical rescue under emergent conditions.

57. Such mismanagement constitutes a substantial departure from the standard of care and directly contributed to E.T.'s severe neonatal injuries, including hypoxic-ischemic encephalopathy, neonatal asphyxia, seizures, and long-term developmental impairments. E.T. was otherwise normal and healthy as reflected in the normal and uncomplicated prenatal course.

58. In addition, Mrs. Wilkening suffered significant physical, emotional, and psychological trauma due to the prolonged, mismanaged delivery and her child's critical condition, including severe pain, anxiety, and ongoing emotional distress related to E.T.'s injuries.

59. As a direct result of the negligence of Dr. Dengler, Mrs. Wilkening sustained physical and emotional pain and suffering, and pecuniary loss.

60. As a direct result of the negligence of Dr. Dengler, Mr. Terrell sustained emotional pain and suffering, and pecuniary loss.

61. As a direct result of the negligence of Dr. Dengler, E.T. sustained permanent injury requiring past and future medical treatment and therapy, attendant care, physical and emotional pain and suffering, and pecuniary loss. E.T.'s birth-related injuries are expected to have a lasting impact on her future employment potential, limiting the types of work she may be able to perform and affecting her earning capacity.

WHEREFORE, Plaintiffs, Julieanne Wilkening, individually and as parent and next friend on behalf of E.T., a minor, and Jon Terrell, individually and as parent and next friend on behalf of E.T., a minor, pray for judgment against Defendants Maj. Katherine Dengler, M.D., Cpt. Ashley Coggins, M.D., and United States of America, jointly and severally, for all damages allowable under Maryland law and in an amount in excess of Seventy-Five Thousand Dollars, ($75,000.00) plus all costs and post-judgment interest at the legal rate of ten percent (10%) per annum from the date of the judgment.

**COUNT II - MEDICAL NEGLIGENCE**
**(Cpt. Ashley Coggins, M.D.)**

62. Plaintiffs incorporate the substance of the foregoing factual allegations into this Count as if fully stated herein, and further state:

63. At all times relevant hereto, Dr. Coggins had a duty to provide Mrs. Wilkening and E.T. with a degree of care and skill exercised by a reasonable and prudent Health Care Provider under the same or similar circumstances.

64. Dr. Coggins breached her duty of care and acted negligently in her management of Mrs. Wilkening and E.T. Her breaches in the standard of care include, but are not limited to, improperly managing Mrs. Wilkening's labor and delivery, failing to anticipate and plan for all

potential complications associated with E.T.'s breech and twin delivery, and delaying the initiation of a cesarean section despite documented advance knowledge of its necessity. Dr. Coggins also failed to respond promptly and appropriately when complications arose during her delivery, and the hysterotomy performed fell below the accepted standard of care. Additionally, she did not take adequate precautions or implement sufficient measures to prevent foreseeable injury to E.T., and otherwise failed to provide medical care consistent with the applicable standard of care.

65. Additionally, Dr. Coggins failed to properly and adequately inform Mrs. Wilkening of the risks of injury to E.T. associated with a vaginal breech delivery and failed to obtain appropriate informed consent as to all delivery options, including a planned cesarean section for Twin B, thereby depriving Mrs. Wilkening of the opportunity to make a fully informed decision regarding the method of delivery.

66. The standard of care mandates that the attending obstetrician, Dr. Coggins, was responsible for leading and directing the delivery, including all critical decisions regarding labor management and emergent interventions. The accepted standard of care for an experienced obstetrician in this high-risk setting required timely recognition and management of complications, proactive planning for potential cesarean delivery, and immediate intervention when fetal distress or difficult presentations arose.

67. Despite documented advance knowledge of E.T.'s breech presentation and the inherent risks of twin delivery, Dr. Coggins failed to act promptly or appropriately when complications occurred, including the inability to deliver E.T.'s right arm and subsequent entrapment of the fetal head. This delay in initiating a timely cesarean section created a

preventable obstetric emergency, necessitating a high-risk surgical rescue under emergent conditions.

68. Such mismanagement constitutes a substantial departure from the standard of care and directly contributed to E.T.'s severe neonatal injuries, including hypoxic-ischemic encephalopathy, neonatal asphyxia, seizures, and long-term developmental impairments. In addition, Mrs. Wilkening suffered significant physical, emotional, and psychological trauma due to the prolonged, mismanaged delivery and her child's critical condition, including severe pain, anxiety, and ongoing emotional distress related to E.T.'s injuries.

69. As a direct result of the negligence of Dr. Coggins, Mrs. Wilkening sustained physical and emotional pain and suffering, and pecuniary loss.

70. As a direct result of the negligence of Dr. Coggins, Mr. Terrell sustained emotional pain and suffering, and pecuniary loss.

71. As a direct result of the negligence of Dr. Coggins, E.T. sustained permanent injury requiring past and future medical treatment and therapy, attendant care, physical and emotional pain and suffering, and pecuniary loss. E.T.'s birth-related injuries are expected to have a lasting impact on her future employment potential, limiting the types of work she may be able to perform and affecting her earning capacity.

WHEREFORE, Plaintiffs, Julieanne Wilkening, individually and as parent and next friend on behalf of E.T., a minor, and Jon Terrell, individually and as parent and next friend on behalf of E.T., a minor, pray for judgment against Defendants Maj. Katherine Dengler, M.D., Cpt. Ashley Coggins, M.D., and United States of America, jointly and severally, for all damages allowable under Maryland law and in an amount in excess of Seventy-Five Thousand Dollars, ($75,000.00) plus all costs and post-judgment interest at the legal rate of ten percent (10%) per

annum from the date of the judgment.

**COUNT III - MEDICAL NEGLIGENCE**
**(United States of America)**

72. Plaintiffs incorporate the substance of the foregoing factual allegations into this Count as if fully stated herein, and further state:

73. The medical personnel at Walter Reed, including but not limited to Dr. Dengler, Dr. Coggins and others were servants, employees, agents and/or ostensible agents of the United States, acting within the scope of their employment and/or agency with the United States at the time they rendered care to Mrs. Wilkening and E.T.

74. The medical personnel at Walter Reed, including but not limited to Dr. Dengler, Dr. Coggins and others had a duty to provide Mrs. Wilkening and E.T. with a degree of care and skill exercised by a reasonable and prudent Health Care Provider under the same or similar circumstances.

75. The treatment rendered to Mrs. Wilkening and E.T. by health care providers at Walter Reed, including but not limited to Dr. Dengler, Dr. Coggins and others breached the standard of care and was negligent, including but not limited to, improperly managing Mrs. Wilkening's labor and delivery, failing to anticipate and plan for all potential complications associated with E.T.'s breech and twin delivery, delaying the initiation of a cesarean section despite documented advance knowledge of its necessity, failing to respond promptly and appropriately when complications arose during Mrs. Wilkening's delivery, and the hysterotomy performed fell below the accepted standard of care. Additionally, they did not take adequate precautions or implement sufficient measures to prevent foreseeable injury to E.T., and otherwise failed to provide medical care consistent with the applicable standard of care.

76. Additionally, the healthcare providers failed to properly and adequately inform Mrs. Wilkening of the risks of injury to E.T. associated with a vaginal breech delivery and failed to obtain appropriate informed consent as to all delivery options, including a planned cesarean section for Twin B, thereby depriving Mrs. Wilkening of the opportunity to make a fully informed decision regarding the method of delivery.

77. The standard of care mandates that the attending obstetricians, Dr. Dengler and Dr. Coggins, were responsible for leading and directing the delivery, including all critical decisions regarding labor management and emergent interventions. The accepted standard of care for an experienced obstetrician in this high-risk setting required timely recognition and management of complications, proactive planning for potential cesarean delivery, and immediate intervention when fetal distress or difficult presentations arose.

78. Despite documented advance knowledge of E.T.'s breech presentation and the inherent risks of twin delivery, Dr. Dengler and Dr. Coggins failed to act promptly or appropriately when complications occurred, including the inability to deliver E.T.'s right arm and subsequent entrapment of the fetal head. This delay in initiating a timely cesarean section created a preventable obstetric emergency, necessitating a high-risk surgical rescue under emergent conditions.

79. Such mismanagement constitutes a substantial departure from the standard of care and directly contributed to E.T.'s severe neonatal injuries, including hypoxic-ischemic encephalopathy, neonatal asphyxia, seizures, and long-term developmental impairments. In addition, Mrs. Wilkening suffered significant physical, emotional, and psychological trauma due to the prolonged, mismanaged delivery and her child's critical condition, including severe pain, anxiety, and ongoing emotional distress related to E.T.'s injuries.

80. As a direct result of the negligence of Dr. Dengler, Dr. Coggins and others, for which the United States is liable, Mrs. Wilkening sustained physical and emotional pain and suffering, and pecuniary loss.

81. As a direct result of the negligence of Dr. Dengler, Dr. Coggins and others, for which the United States is liable, Mr. Terrell sustained emotional pain and suffering, and pecuniary loss.

82. As a direct result of the negligence of Dr. Dengler, Dr. Coggins and others, for which the United States is liable, E.T. sustained permanent injury requiring past and future medical treatment and therapy, attendant care, physical and emotional pain and suffering, and pecuniary loss. E.T.'s birth-related injuries are expected to have a lasting impact on her future employment potential, limiting the types of work she may be able to perform and affecting her earning capacity.

WHEREFORE, Plaintiffs, Julieanne Wilkening, individually and as parent and next friend on behalf of E.T., a minor, and Jon Terrell, individually and as parent and next friend on behalf of E.T., a minor, pray for judgment against Defendants Maj. Katherine Dengler, M.D., Cpt. Ashley Coggins, M.D., and United States of America, jointly and severally, for all damages as allowed under 28 U.S.C. § 2675(b), in an amount in excess of Seventy-Five Thousand Dollars, ($75,000.00), plus all costs and post-judgment interest at the legal rate of ten percent (10%) per annum from the date of the judgment.

**COUNT IV - RESPONDEAT SUPERIOR**
**(United States of America)**

83. Plaintiffs incorporate the substance of the foregoing factual allegations into this Count as if fully stated herein, and further state:

84. At all times relevant hereto, Dr. Dengler, Dr. Coggins and others rendered care to Mrs. Wilkening and E.T. at Walter Reed, and were servants, employees, agents and/or ostensible agents of the United States, acting within the scope of their employment and/or agency with the United States at the time they rendered care to Mrs. Wilkening and E.T.

85. At all relevant times, Walter Reed was owned, operated, and controlled by the United States, including through its agencies, departments, employees, and agents. All individuals whose negligent acts or omissions are alleged herein including Dr. Dengler, Dr. Coggins and others were employees or agents of the United States acting within the course and scope of their employment as defined by 28 U.S.C. § 2671.

86. By operation of law, under the doctrine of respondeat superior, as the master, employer and/or principal responsible for the act of its servants, employees, agents and/or ostensible agents the United States is liable for the negligence of its health care providers, including Dr. Dengler, Dr. Coggins and others at Walter Reed for the negligent care they rendered to Mrs. Wilkening and E.T.

87. The United States, acting through its servants, employees, agents and/or ostensible agents including Dr. Dengler, Dr. Coggins and others, had a duty to use that degree of care and skill in its treatment of Mrs. Wilkening and E.T., which reasonably competent health care providers, engaged in similar practice and acting in similar circumstances, would use.

88. The treatment rendered to Mrs. Wilkening and E.T. by health care providers at Walter Reed, including but not limited to Dr. Dengler, Dr. Coggins and others breached the standard of care and was negligent, including but not limited to, improperly managing Mrs. Wilkening's labor and delivery, failing to anticipate and plan for all potential complications associated with E.T.'s breech and twin delivery, delaying the initiation of a cesarean section

despite documented advance knowledge of its necessity, failing to respond promptly and appropriately when complications arose during Mrs. Wilkening's delivery, and the hysterotomy performed fell below the accepted standard of care. Additionally, they did not take adequate precautions or implement sufficient measures to prevent foreseeable injury to E.T., and otherwise failed to provide medical care consistent with the applicable standard of care.

89. Additionally, the healthcare providers failed to properly and adequately inform Mrs. Wilkening of the risks of injury to E.T. associated with a vaginal breech delivery and failed to obtain appropriate informed consent as to all delivery options, including a planned cesarean section for Twin B, thereby depriving Mrs. Wilkening of the opportunity to make a fully informed decision regarding the method of delivery.

90. The standard of care mandates that the attending obstetricians, Dr. Dengler and Dr. Coggins, were responsible for leading and directing the delivery, including all critical decisions regarding labor management and emergent interventions. The accepted standard of care for an experienced obstetrician in this high-risk setting required timely recognition and management of complications, proactive planning for potential cesarean delivery, and immediate intervention when fetal distress or difficult presentations arose.

91. Despite documented advance knowledge of E.T.'s breech presentation and the inherent risks of twin delivery, Dr. Dengler and Dr. Coggins failed to act promptly or appropriately when complications occurred, including the inability to deliver E.T.'s right arm and subsequent entrapment of the fetal head. This delay in initiating a timely cesarean section created a preventable obstetric emergency, necessitating a high-risk surgical rescue under emergent conditions.

92. Such mismanagement constitutes a substantial departure from the standard of care and directly contributed to E.T.'s severe neonatal injuries, including hypoxic-ischemic encephalopathy, neonatal asphyxia, seizures, and long-term developmental impairments. In addition, Mrs. Wilkening suffered significant physical, emotional, and psychological trauma due to the prolonged, mismanaged delivery and her child's critical condition, including severe pain, anxiety, and ongoing emotional distress related to E.T.'s injuries.

93. As a direct and proximate result of the negligence of the employees, servants, agents and/or ostensible agents of the United States, including but not limited to Dr. Dengler, Dr. Coggins and others, for which the United States is liable, Mrs. Wilkening sustained physical and emotional pain and suffering, and pecuniary loss.

94. As a direct and proximate result of the negligence of the employees, servants, agents and/or ostensible agents of the United States, including but not limited to Dr. Dengler, Dr. Coggins and others, for which the United States is liable, Mr. Terrell sustained emotional pain and suffering, and pecuniary loss.

95. As a direct and proximate result of the negligence of the employees, servants, agents and/or ostensible agents of the United States, including but not limited to Dr. Dengler, Dr. Coggins and others, for which the United States is liable, E.T. sustained permanent injury requiring past and future medical treatment and therapy, attendant care, physical and emotional pain and suffering, and pecuniary loss. E.T.'s birth-related injuries are expected to have a lasting impact on her future employment potential, limiting the types of work she may be able to perform and affecting her earning capacity.

WHEREFORE, Plaintiffs, Julieanne Wilkening, individually and as parent and next friend on behalf of E.T., a minor, and Jon Terrell, individually and as parent and next friend on

behalf of E.T., a minor, pray for judgment against Defendants Maj. Katherine Dengler, M.D., Cpt. Ashley Coggins, M.D., and United States of America, jointly and severally, for all damages as allowed under 28 U.S.C. § 2675(b), in an amount in excess of Seventy-Five Thousand Dollars, ($75,000.00), plus all costs and post-judgment interest at the legal rate of ten percent (10%) per annum from the date of the judgment.

Respectfully submitted,

SHULMAN ROGERS, P.A.

By: ______________________________

Michael V. Nakamura (Federal Bar ID: 08915)
mnakamura@shulmanrogers.com
Daniel P. Connors (Federal Bar ID: 21329)
dconnors@shulmanrogers.com
12505 Park Potomac Avenue, Sixth Floor
Potomac, Maryland 20854
Telephone: (301) 230-5200
Facsimile: (301) 230-2891

*Counsel for Plaintiffs*